UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 12-80406-CIV-RYSKAMP/HOPKINS

CARLOS MONTERO, as personal Representative
of the Estate of RICHARD MONTERO, deceased,

     Plaintiff,

vs.

RAMESH NANDLAL, in his individual capacity,

     Defendant.
_____/

## ORDER GRANTING MOTION FOR JUDGMENT AS A MATTER OF LAW IN FAVOR OF DEFENDANT RAMESH NANDLAL

THIS CAUSE comes before the Court pursuant to Defendant Ramesh Nandlal's ("Nandlal") motion for entry of judgment, filed May 11, 2015 **[DE 117]**. Plaintiff Carlos Montero ("Plaintiff"), as Personal Representative of the Estate of Richard Montero ("Montero") responded on June 1, 2015 **[DE 120]**. Nandlal replied on June 10, 2015 **[DE 122]**. The Court requested on July 16, 2015 that the parties order the transcript in this matter, which transcript was filed on August 30, 2015 **[DE 127, 128, 129]**. This matter is ripe for adjudication.

### I.    BACKGROUND AND PROCEDURAL HISTORY

This action arises out of an incident that occurred at the intersection of Jog Road and Summit Boulevard in Palm Beach County, Florida during the early morning hours of April 9, 2010. Palm Beach County Sheriff's Deputies Nandlal and Victor Blackman ("Blackman") responded to an abandoned vehicle call in the middle of the aforesaid intersection, where they discovered Montero, who appeared to be intoxicated, asleep at the wheel of a Ford Explorer. Nandlal and Blackman decided not to arrest Montero and called a friend of Montero's to come

and pick up Montero. When Montero learned that the deputies were going have his car towed, he became angry and physically violent. Montero and the deputies engaged in a physical struggle, which culminated in Nandlal's shooting Montero four times in Montero's midsection. Montero died as a result. At issue for purposes of this motion is Plaintiff's 42 U.S.C. § 1983 claim that Nandlal used excessive force against Montero in violation of the Fourth Amendment.[1]

At the close of discovery, Nandlal moved for summary judgment based on qualified immunity. The Court denied the motion, finding that there were genuine issues of material fact requiring submission of the case to a jury. The Court of Appeals affirmed that ruling in an unpublished opinion, therein concluding that "no reasonable officer would have used deadly force against Montero under the circumstances and that clearly established law gave Nandlal fair notice that his actions violated the Fourth Amendment." [DE 85, p. 2]. The Court of Appeals nonetheless noted that "a jury might well find that Nandlal reasonably perceived Montero to be a serious threat because he was not in fact subdued at the time of the shooting or because at some point during the struggle he had reached for Nandlal's gun belt." *Id.* at 13.

Trial commenced on the § 1983 claim against Nandlal. At the close of Plaintiff's case, Nandlal made a Rule 50 motion, arguing that the evidence did not demonstrate that Nandlal used excessive force against Montero and that Nandlal was entitled to qualified immunity. The Court deferred ruling on the motion until the close of evidence, at which time Nandlal renewed his motion. The Court elected to defer ruling on the motion until after the verdict.

The jury considered a general verdict form that posed the following question:

---

[1] The operative complaint alleged violation of Montero's Fourth and Fourteenth Amendment rights. The case proceeded to the jury solely on the Fourth Amendment claim.

> Do you find from a preponderance of the evidence that Carlos
> Montero, as Personal Representative of the Estate of Richard
> Montero, deceased, has proved that Ramesh Nandlal intentionally
> used excessive or unreasonable deadly force upon Richard
> Montero during his arrest?

The jury answered the question in the affirmative and awarded Plaintiff $540,000 in compensatory damages. The jury then proceeded to the special interrogatory verdict question, which posed the following:

> Do you find by a preponderance of the evidence that Deputy
> Nandlal made an objectively reasonable mistake when he
> perceived that Richard Montero posed an imminent threat of
> serious physical harm to the deputies or others at the time that
> Deputy Nandlal shot Richard Montero with his firearm?

The jury answered the special interrogatory question in the affirmative.

Nandlal argues that the jury's affirmative answer to the special interrogatory is a determination that his use of deadly force was an "objectively reasonable mistake" such that he is entitled to judgment based on qualified immunity. Nandlal also argues that the evidence supporting the finding of excessive force is insufficient.

## II.    LEGAL STANDARD

"A claim that law-enforcement officers used excessive force to effect a seizure is governed by the Fourth Amendment's "reasonableness" standard." *Plumhoff v. Rickard*, 572 U.S. —, —, 134 S. Ct. 2012, 2020 (2014) (citing *Graham v. Connor*, 490 U.S. 386, 388, 109 S.Ct. 1856, 1867-68, (1989); *Tennessee v. Garner*, 471 U.S. 1, 7, 105 S.Ct. 1694, 1699 (1985)). *See also San Francisco v. Sheehan*, — U.S. —, —,135 S.Ct. 1765, 1775 (2015) ("The Fourth Amendment standard is reasonableness[.]"). "[D]etermining the objective reasonableness of a

...

4

particular seizure under the Fourth Amendment 'requires a careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake.'" *Plumhoff*, 572 U.S. at —,134 S.Ct. at 2020 (quoting *Graham*, 490 U.S. at 396, 109 S.Ct. at 1865) (internal quotation omitted).

The inquiry requires analyzing the totality of the circumstances. *See id.* (citing *Graham*, 490 U.S. at 396, 109 S.Ct. at 1865). Review of the totality of the circumstance must be conducted "from the perspective 'of a reasonable officer at the scene, rather than with the 20/20 vision of hindsight.'" *See id.* (quoting *Graham*, 490 U.S. at 396, 109 S.Ct. at 1865). *See also Mobley v. Palm Beach County Sheriff's Dept.*, 783 F.3d 1347, 1354 (11th Cir. 2015) ("The test is not a subjective one but asks whether the officer's actions in applying the force were *objectively* reasonable.") (emphasis in original); *Crenshaw v. Lister*, 556 F.3d 1283, 1290 (11th Cir. 2009) ("The question is whether the officer's conduct is objectively reasonable in light of the facts confronting the officer.") (quoting *Vinyard v. Wilson*, 311 F.3d 1340, 1347 (11th Cir. 2002)). The analysis takes in to account "'the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Plumhoff*, 572 U.S. at —, 134 S.Ct. at 2020 (quoting *Graham*, 490 U.S. at 396-97, 1009 S.Ct. at 1865). "[I]t is reasonable for the police to move quickly if delay 'would gravely endanger their lives or the lives of others.' This is true even when, judged with the benefit of hindsight, the officers may have made 'some mistakes.'" *Sheehan*, — U.S. at —, 135 S.Ct. at 1775 (quoting *Warden, Md. Penitentiary v. Hayden* 387 U.S. 294, 298-99, 87 S.Ct. 1642, 1646 (1967); *Heien v. North Carolina*, 574 U.S. —, —, 135 S.Ct. 530, 536 (2014)).

5

When evaluating the reasonableness of force used, courts consider "the severity of the crime at issue; whether the suspect poses an immediate threat to the safety of the officers or others, and whether the suspect actively resisted arrest or attempted to evade arrest by flight." *Graham*, 490 U.S. at 396, 109 S.Ct. at 1872 (citing *Garner*, 471 U.S. at 8-9, 105 S.Ct. at 1699-1700). These factors are not to be applied mechanically, however. *See Salvato v. Miley*, 790 F.3d 1286, 1293 (11th Cir. 2015) (citing *Penley v. Eslinger*, 605 F.3d 843, 850 (11th Cir. 2010)). "[I]n the end we must still slosh our way through the factbound morass of 'reasonableness.'" *Id.* (quoting *Scott v. Harris*, 550 U.S. 372, 383 (2007)).

The qualified immunity defense protects governmental officials from suit in their individual capacities for acts based on the use of their discretion. *See Harlow v. Fitzgerald*, 457 U.S. 800, 815, 102 S.Ct. 2727, 2737 (1982). "The goal of qualified immunity is 'to allow officials to carry out discretionary duties without the chilling fear of personal liability.'" *Mobley*, 783 F.3d at 1352 (quoting *McCullough v. Antolini*, 559 F.3d 1201, 1205 (11th Cir. 2009)). A public official must demonstrate that he was "act[ing] within the scope of his discretionary authority" to obtain qualified immunity. *Mobley*, 783 F.3d at 1352 (quoting *Morton v. Kirkwood*, 797 F.3d 1276, 1280 (11th Cir. 2013)). "Discretionary authority" "include[s] all actions of a governmental official that (1) were undertaken pursuant to the performance of his duties, and (2) were within the scope of his authority." *Jordan v. Doe*, 38 F.3d 1559, 1566 (11th Cir. 1994) (internal quotation marks omitted).

If the public official makes this showing, the claimant must then demonstrate that (1) "the facts show that the official violated the plaintiff's constitutional rights" and (2) that "the law clearly established those rights at the time of the alleged misconduct." *Mobley*, 783 F.3d at 1352,

(quoting *Pearson v. Callahan*, 555 U.S. 223, 236, 129 S.Ct. 808, 818 (2009)).  *See also Sheehan*, — U.S. at —, 135 S.Ct. at 1774 ("Public officials are immune from suit under 42 U.S.C. § 1983 unless they have 'violated a statutory or constitutional right that was clearly established at the time of the challenged conduct.'" (quoting *Plumhoff*, 572 U.S. at —, 134 S. Ct. at 2023) (internal quotation marks omitted).  Qualified immunity affords broad protection to "all but the plainly incompetent or those who knowingly violate the law." *See Malley v. Briggs*, 475 U.S. 335, 341, 475 U.S. 335, 1096 (1986); *Hutton v. Strickland*, 919 F.2d 1531, 1537 (11th Cir. 1990).

"A defendant who does not win summary judgment on qualified immunity grounds may yet prevail on those grounds at or after trial on a motion as a matter of law." *Cottrell v. Caldwell*, 85 F.3d 1480, 1487 (11th Cir. 1996) (quoting *Kelly v. Curtis*, 21 F.3d 1544, 1546-47 (11th Cir. 1994)).  "[W]hat is considered to be the 'facts' at the summary judgment stage may not turn out to be the actual facts if the case goes to trial[.]" *Id.* at 1486.  *See Snyder v. Trepagnier*, 142 F.3d 791, 800 (5th Cir. 1998) (affirming district court's post-trial grant of qualified immunity to officer where trial court submitted excessive force and qualified immunity issues as separate jury questions and where jury found that officer violated plaintiff's right to be free from excessive force but was nevertheless entitled to qualified immunity).  A jury finding of qualified immunity despite a jury finding of a constitutional violation is the "essence" of qualified immunity: "an officer may make mistakes that infringe constitutional rights and yet not be held liable where, given unclear law or uncertain circumstances, it cannot be said that she knew she was violating a person's rights." *Presley v. City of Benbrook*, 4 F.3d 405, 409 (5th Cir. 1993) (citing *Anderson v. Creighton*, 483 U.S. 635, 642, 107 S.Ct. 3034, 3039-40 (1987)).

"Under Rule 50, a party's motion for judgment as a matter of law can be granted at the

close of evidence or, if timely renewed, after the jury has returned its verdict, as long as there is no legally sufficient evidentiary basis for a reasonable jury to find for the non-moving party." *Chaney v. City of Orlando, Fla.*, 483 F.3d 1221, 1227 (11th Cir. 2007) (internal quotations and formatting omitted). In considering a Rule 50 motion, the Court must view the facts in the light most favorable to the non-movant. *See id.* at 1222.

### III. DISCUSSION

Here, there is no question that Nandlal was acting within his discretionary duties at the time of the incident, as Nandlal engaged in all of the challenged actions while conducting arrest functions as a deputy sheriff and while on duty. The burden thus shifts to Plaintiff to demonstrate that qualified immunity is inappropriate. *See Jordan*, 38 F.3d at 1566. Plaintiff must show that, when viewed in the light most favorable to him, the facts demonstrate that Nandlal violated Montero's Fourth Amendment right, which right was clearly established at the relevant time. *See Mobley*, 783 F.3d at 1352.

The law was clearly established in the Eleventh Circuit as of April 2010 that police use of excessive force during an arrest is a constitutional violation. In *Gilmere v. City of Atlanta*, 774 F.2d 1495, 1496-97 (11th Cir. 1985), law enforcement officers arrived at the home of an intoxicated man and ordered him to a police car for questioning. The man initially resisted by flailing his arms and attempting to flee, but these efforts were ineffective given his drunken state. *See id*. at 1497. The officers then escorted the man by force and began beating the man about the head. *See id.* The man broke free from their hold as they approached the car. *See id.* A scuffle ensued, and one of the officers shot the man dead. *See id.* The Eleventh Circuit affirmed the

district court's finding of § 1983 liability on the part of the officers for both the shooting and the beating, noting that the man's small size, his intoxicated state and that the beating occurred "with little or no provocation." *See id.* at 1501. *See also Priester v. City of Riviera Beach, Fla.*, 208 F.3d 919, 927 (11th Cir. 2000) (denying qualified immunity to officer who allowed his dog to assault compliant, non-threatening arrestee for two minutes while arrestee was lying in prone position); *Smith v. Mattox*, 127 F.3d 1416, 1418 (11th Cir. 1997) (denying qualified immunity to officer who broke the arm of a once hostile arrestee who had obeyed an instruction to get on the ground and who "docilely submitted to arrest").

As to whether Nandlal's Fourth Amendment right was violated, the Court has reviewed the trial transcript and has concluded that the evidence presented at trial supports the jury's finding that Nandlal used excessive force against Montero but that Nandlal made an objectively reasonable mistake in doing so and is therefore entitled to qualified immunity.

At approximately 6:00 a.m. on April 9, 2010, Nandlal and Blackman responded to an abandoned vehicle call regarding a vehicle located in the intersection of Jog Road and Summit Boulevard. (T2, 50).[2] Upon arrival, the deputies discovered Montero passed out behind the wheel of a Ford Explorer. The engine was running, and the vehicle was in drive. Montero's foot was on the brake. (T1, 161; T2, 51). The deputies knocked on the window for a couple of minutes to wake Montero. (T1, 161; T2, 51). According to Nandlal, Montero "would wake up a few times and look at us, then go back right to what -- he was almost sleeping." (T2, 52). Montero woke up and rolled his window down partially. (T1, 161). The deputies got him to put

---

[2] Trial transcript references are designated as "T1" and "T2." "T1" refers to the April 27, 2015 trial date, and "T2" refers to the April 28, 2015 trial date.

the window down fully, reached into the vehicle, put the vehicle in park and retrieved the keys. (T1, 161). The deputies had Montero exit the car. They noted that Montero smelled strongly of alcohol and that he had red, bloodshot and watery eyes. (T1, 161; T2, 53). Montero staggered and appeared to be intoxicated. (T2, 53). The officers decided not to issue a citation to Montero and instead called Nancy Schiff ("Schiff"), Montero's live-in girlfriend turned roommate, to come and get Montero. Blackmun placed the phone call.

Schiff testified that she received a phone call from a sheriff's deputy at approximately 6:30 a.m. (T1, 116). Schiff testified that the deputy told her that Montero was asleep at a red light, that she should come get him, and that if she did not come and get him, Montero would be arrested. (T1, 116). Blackman testified that he asked Schiff to bring a second driver with her so that Montero's vehicle would not have to be towed. (T1, 168). Schiff arrived at the intersection without a second driver.

When Schiff arrived at the intersection, she saw Montero's Ford Explorer "in the middle of the road." (T1, 117). Montero was sitting in the Explorer. (T1, 117). One of the deputies ordered Montero to get into Schiff's car, and Montero complied. (T1, 117). Schiff got into her car and told Montero that the deputies were going to tow the Explorer. (T1, 118). Schiff says that upon learning that his car would be towed, Montero "got very upset and he was -- he may have put his legs outside of the car at that time, and he was begging for them not to tow the car and please don't tow it. I'm disabled. I'm broke." (T1, 118).

The deputies came to the side of the car. (T1, 118). When Montero put his legs outside of the car, the deputies ordered him to get back into the car. (T1, 118). "[T]hey were ordering him to get back in the car when the legs came out," Schiff explained. (T1, 129). Montero did

not obey the instruction to get back in the car. Instead, he stood up and continued to ask the deputies not to tow his car. (T1, 119, 129). At that point, the deputies said they were going to arrest Montero. (T1, 119). Blackmun put a handcuff on Montero's left wrist. (T1, 119, 163).[3] Blackmun intended to arrest Montero for disorderly intoxication. (T1, 152).

According to Schiff, Montero became "enraged." (T1, 130). Montero "started yelling and swearing that you told me you weren't going to tow the car. You're going to F me. Why are you trying to F me? Why are you doing this to me?" (T1, 119). Montero "started to struggle and pull away from the deputies." (T1, 119). Montero pushed both Nandlal and Blackmun. (T1, 130). Blackman was pushed to the ground. (T1, 167). Montero was also pushed to the ground and fell on his back. (T2, 63). Schiff describes the escalating melee:

> And then a huge struggle ensued, an there was -- there was, you know, cussing and yelling, and they were saying, oh, you know, get down on the ground, and he was saying, No. You're trying to F me, and all this stuff. And there was lots of struggling and fighting. They were grabbing him. They were trying to pull him down. Eventually, they all ended up down on the ground in a pile again, fighting and trying to cuff him.

(T1, 120). Schiff was screaming "Stop it, Stop it," during the struggle. (T1, 122).

Blackman tried to get Montero "off balance by trying to get his feet out from under him. None of that worked." (T1, 170). Blackman recalls that Montero yelled "I'm going to rip your balls off." (T1, 173). Blackman was trying to keep Montero from grabbing his gun. (T1, 224). Blackman says that he recalls Montero grabbing Blackman's belt where Blackman keeps his magazines and that the belt stretched. (T1, 146).

---

[3] Nandlal recalled the handcuff being on Montero's right wrist. (T1, 192).

11

Nandlal also unsuccessfully used his hands to try to control Montero.  (T1, 170, 172-73; T2, 63-64).  Nandlal also recalls that Montero said he would "rip [his] balls off" and started grabbing at Nandlal's crotch area while Nandlal was on the ground.  (T2, 64).  Montero was simultaneously attempting to bite Nandlal's legs.  (T2, 67).  Montero grabbed Nandlal's gun belt several times while Nandlal was on the ground.  (T2, 68).  Nandlal testified that Montero "grabbed my gun belt and stuff on my belt.  I'm not sure specifically what he grabbed, but he was grabbing my belt."  (T1, 198-99).  *Id.* at 200 ("[A]t one time he was actually grabbing my gun belt.").  Nandlal kicked Montero and slid away on his back to keep Montero from grabbing at his gun.  (T1, 200).

Nandlal tasered Montero in the front of Montero's body, to no effect.  (T2, 64).  Blackman tasered Montero in the back of Montero's body, again to no effect.  (T2, 64).  Blackman tasered Montero via both the conventional tasering method and the dry stun tasering method.  (T1, 172).  Nandlal used his taser as a weapon, trying to hit Montero with the taser.  This tactic was also unavailing.  (T2, 67).  Schiff admits that the tasering had no effect on Montero and that Montero did not respond to the deputies' verbal instructions to stop fighting, get down and give them their hands.  (T1, 132-33).  Blackman stated that he was never able to gain control over Montero.  (T1, 143, 149, 150, 165, 176, 179-80).  Nandlal stated the same.  (T2, 65, 66, 67, 81, 82).

According to Schiff, the fight on the ground "went on for, you know, minutes.  This big, you know, struggle and fighting.  And they finally got him subdued, spread-eagle.  One officer had one arm and a leg.  The other officer had the other arm and a leg.  Laying on the ground, like this, with and officer on either side and he was still squirming and everything."  (T1, 120).

Schiff described Montero as "subdued." (T1, 120). When asked to clarify what she meant by saying that Montero was subdued but still struggling, she stated that Montero "was wiggling around, still wiggling around. He was still struggling." (T1, 121). Schiff eventually responded "no" when asked whether Montero "surrendered" and explained that "[h]e kept struggling." (T1, 133-34).

Nandlal testified that during the fight he was knocked to the ground a second time. (T2, 65, 66). Nandlal "kicked back once [Montero] started reaching...to gain a little distance." (T2, 121). Nandlal informed Montero that if Montero continued struggling, he was going to shoot him. Montero kept squirming, and Nandlal repeated the directive to stop struggling or Nandlal would shoot. Nandlal "said it a couple of times, and then he shot him." (T1, 121, 134). Schiff was unable to see Nandlal pull out his gun and "did not see how he even got the gun out." (T1, 131). Blackman had moved away from Montero prior to Nandlal firing the shots. (T1, 190). Nandlal shot Montero's midsection four times, as much as Nandlal believed was necessary to stop the threat. (T2, 78). Montero was on the ground "in a slightly seated position" at the time of the shooting. (T1, 148). Nandlal was coming up from lying on his back when he fired the shots. (T2, 124). Nandlal said he had only a split second to think about the decision to shoot, had no time for deliberation between shots and fired the shots while coming up from lying on his back. (T2, 143; T1, 189; T2, 70). Nandlal believed that Montero

> was going to get either my firearm or Deputy Blackman's firearm and kill both of us that morning because of the struggle, the fight. He kept on reaching for our belts. We were on the ground most of the time. I thought to myself that he would have eventually gotten the advantage because he wasn't feeling anything, didn't look like he was getting tired, like we were. And I believe he would have

eventually gotten either my gun or Deputy Blackman shot, one or both of us that morning.

(T2, 80-81).

Schiff testified that, upon being shot, Montero "turned onto his stomach and was trying to crawl, and you know, everybody was out of breath." (T1, 123). Schiff stated that Blackman "put his boot on him and pushed him with his boot so he would stop crawling. He was crawling and he pushed him with his boot. He didn't kick him. He pushed him. And then he put the cuffs on -- or the other cuff on." (T1, 123, 136). By then, backup had arrived on the scene. A backup officer assisted Blackman in handcuffing Montero. (T2, 78). Montero was unarmed. (T1, 197, 198).

Sandra Wissinger ("Wissinger"), a school psychologist on her way to work at a nearby elementary school, witnessed a portion of the altercation. Wissinger had stopped at a red light at the intersection and saw two officers struggling to control Montero. (T2, 216). Wissinger heard a woman saying "stop it" and heard someone issue an order to stay down. (T2, 217, 220). She heard the sound of bodies going down on the ground. (T2, 220). Wissinger heard Montero say "I'm going to kill you, mother Fers." (T2, 236). Montero was "trying to...grab and get their guns...getting close...like his hands close to that part of the police officer's body." (T2, 218, 219). *See also* T2, 237 (Montero "was trying to get their guns. The officers have to...jump on him to control him, but he was very strong. And he was...trying to get the gun and saying, I'm going to kill you, that -- mother Fers."). Wissinger acknowledges that she did not actually see Montero grab the gun belt but that he was "[j]ust trying to get to that area." (T2, 240). *See id.* at 249 (Montero was "getting his hands close to that to that -- the gun belt."). She never had the impression that the officers had control over Montero. (T2, 220-21).

Once the light at the intersection changed, Wissinger continued on her way to school. After parking at the school parking lot, she charged her cell phone so that she could call 911. (T2, 241, 220). Wissinger called 911 "so they could send more officers to help" Nandlal and Blackman. (T2, 233). Wissinger got out of her car and walked to her classroom. She heard a gunshot after she arrived at her classroom. (T2, 241).

The evidence set forth at trial describes a lengthy physical altercation between the deputies and Montero wherein Montero threatened to kill the officers, threatened to rip the officers' balls off, and violently resisted both officers to the point of knocking both of them to the ground. Nandlal was knocked to the ground twice. Montero grabbed the deputies' gun belts, grabbed at Nandlal's crotch and attempted to bite Nandlal. Although Montero was originally to be arrested for disorderly intoxication, a misdemeanor, Montero's battering the deputies was felonious. Wissinger's testimony indicates that the struggle continued for some time. The struggle was already underway when Wissinger stopped at the red light. Wissinger sat through the red light, drove to school, parked her car, charged her phone, made the 911 call and walked to her classroom prior to hearing a gunshot.

Montero did not obey verbal instructions to surrender. The deputies' efforts to gain control of Montero via hand maneuvers failed. Repeated tasering had no effect on Montero. Nandlal's attempting to hit Montero with his taser also failed. Nandlal warned Montero that Montero was in danger of being shot. Nandlal and Blackman testified that they never had control over Montero. Wissinger testified that Nandlal and Blackman never had control over Montero and called 911 to obtain backup for Nandlal and Blackman. Schiff, who saw the entirety of the altercation, testified that Montero never surrendered.

"'[I]f the suspect threatens the officer with a weapon or there is probable cause to believe that [the suspect] has committed a crime involving the infliction or threatened infliction of serious physical harm,' then it is constitutionally permissible to use deadly force to prevent escape of the suspect." *McCormick v. City of Fort Lauderdale*, 333 F.3d 1234, 1246 (11th Cir. 2003) (quoting *Garner*, 471 U.S. at 11, 105 S.Ct. at 1701). "Because the Constitution permits the use of deadly force to prevent a violent suspect from escaping, the Constitution must also permit the use of deadly force against a suspect who poses not merely an escape risk (because he is not yet in police control), but also an imminent threat of danger to a police officer or others." *Id.* Caselaw from the Eleventh Circuit that predates April 2010 indicates that officers may use deadly force against individuals who pose a threat to the officer or others. The instant case is similar to *McCormick*, wherein a deputy was found to have acted reasonably when he shot a man armed with walking stick who appeared to deputy to be advancing on the deputy. *See id.* The deputy had fallen backwards, was in a position vulnerable to attack, and was concerned that the man could potentially access his firearm. *See id*. *See also Willingham v. Loughnan*, 321 F.3d 1299, 1301, 1304 (11th Cir. 2003) (granting qualified immunity to officers who shot unarmed woman who had thrown a glass at one officer and thrown a knife at another officer in an attempt to kill him).

The instant case is distinguishable from cases in which law enforcement officers used force against arrestees who did not pose a threat to the officers or others. As noted, in *Gilmere*, law enforcement officers were denied qualified immunity for beating and shooting an unarmed arrestee whose efforts at physical resistance were ineffective. 774 F.2d at 1497, 1501. *See also Priester*, 208 F.3d at 927 (denying qualified immunity to officer who allowed his dog assault of

16

compliant arrestee); *Smith*, 127 F.3d at 1418 (denying qualified immunity to officer who broke the arm of compliant arrestee).

Nandlal faced a tense and rapidly evolving situation in which he had been battered and threatened multiple times. He feared that Montero was attempting to access his firearm. The evidence presented at trial was sufficient to support the jury's verdict that Nandlal made an objectively reasonable mistake in using deadly force against Montero. Where an officer uses deadly force against an arrestee based on a reasonable, if mistaken, belief that an arrestee poses an imminent threat of death or great bodily harm to the officer, the officer is entitled to qualified immunity.

### IV.    CONCLUSION

THE COURT, being fully advised and having considered the pertinent portions of the record, hereby

ORDERS AND ADJUDGES that Nandlal's motion for judgment as a matter of law, filed May 11, 2015 **[DE 117]**, is GRANTED. It is further

ORDERED AND ADJUDGED that Plaintiff's motion for additional briefing, filed September 18, 2015 **[DE 130]**, is DENIED. Final judgment shall be entered by separate order.

DONE AND ORDERED at Chambers in West Palm Beach, Florida, this 22d day of September, 2015.

S/Kenneth L. Ryskamp
KENNETH L. RYSKAMP
UNITED STATES DISTRICT JUDGE